GARFIELD KEMP, *et al.*

*v.*

JENNINGS B. BOYD

(No. 15000)

Decided February 21, 1981.

*William L. Jacobs* for appellant.

*John P. Anderson* for appellees.

McGRAW, JUSTICE:

The appellant, Jennings B. Boyd, appeals from the judgment order of the Circuit Court of McDowell County, entered on August 28, 1980, removing him from office as an elected commissioner of the County Commission of McDowell County. The petition in the removal proceedings, commenced in the names of eight persons identified as "bona fide citizens, residents, voters and taxpayers of, in and for McDowell County," charges that the appellant "has been and is guilty of official misconduct, malfeasance and/or misfeasance in office and neglect of duty." The charges stated in paragraphs four through twelve of the petition are summarized in paragraph thirteen as action and conduct which "have been wilful, intentional and flagrant violations of his duty and/or the law." Upon consideration of the record, together with the briefs and arguments of counsel, the circuit court held that three of the charges were sustained by the evidence and concluded, as a matter of law, that

> "The defendant, Jennings B. Boyd, as a member of the County Commission of the County of McDowell, State of West Virginia, during his current term of office, has been guilty of such official misconduct, willful neglect of duty, misfeasance in office, and malfeasance in office, such as to warrant his removal as a Comissioner of the County Commission of the County of McDowell."

The three charges upon which the removal order is based are in substance: (1) that the appellant willfully neglected his duty as a public officer by absenting himself from a meeting of the Board of Equalization and Review on February 28, 1980 for a period of approximately six hours, (2) that the appellant was guilty of malfeasance in office in that he submitted vouchers for mileage reimbursement, voted for the mileage reimbursement, and received payment of reimbursement without statutory authorization; and (3) that by arranging and voting for gravel hauling and laying authorizations for county roads prior to

any action by the county commission to determine the cost thereof, the appellant was guilty of neglect of duty and misfeasance in office.[1]

The major issue for our consideration is whether the evidence is sufficient to support the findings of the circuit court and to sustain the charges upon which the removal order was based. A review of the record leads us to conclude that, under the facts of this case, the evidence presented

---

[1] The findings of fact of the circuit are stated in part as follows:

(1) "Upon the issue of the increasing of taxes by the McDowell County Commission, sitting as a Board of Equalization and Review, on the following dates, February 19, 1980, and February 28, 1980, · · · the Court does find that the defendant, Jennings B. Boyd, in leaving the meeting of the McDowell County Commission, sitting as a Board of Equalization and Review for this county, on the 28th day of February, 1980, at approximately 4:00 p.m. on said date, and not returning until approximately 10:20 p.m. on said date, and thereafter refusing qualified citizens of this county an opportunity to be heard and present evidence, willfully neglected the duty imposed upon him as a public officer and is, therefore, guilty of willful neglect of duty."

(2) "The submission on the McDowell County Commission by the defendant of vouchers for mileage reimbursement and the defendant's action in participating in approving the payment of said vouchers for his travel from his home to the McDowell County Courthouse · · · is not justified by any statute or law of this State. This Court finds that the defendant had no authority to pay himself mileage for any travel not prescribed by the statute · · ·. The Court, therefore, finds that the defendant, Jennings B. Boyd, did repeatedly, as a McDowell County Commissioner, submit vouchers for mileage reimbursement and did vote for payment to himself and receive payment of reimbursement for mileage charged not in the official performance of his duty, and such conduct constitutes malfeasance in office."

(3) "With respect to the charge of directing the hauling of gravel in the areas of Gilliam, Upland and Maybeury, in McDowell County, West Virginia, either individually or as President and member of the McDowell County Commission, in January and February, 1979, the defendant, as an official of the McDowell County Commission, voted for, authorized and directed Frank Serge, Jr., to order the hauling of said gravel in the above said areas, on the 13th day of February, 1979, when the said Frank Serge, Jr. was not an employee of the McDowell County Commission and had no authority to do so · · ·. The defendant had a clear duty prior to any act by said Commission to determine the cost and price of said hauling and laying of gravel and his failure and action in voting for the above-referred to authorizations, is a neglect of his duty as a public official and is misfeasance in office."

does not justify the removal of the appellant from office and we reverse the judgment of the circuit court.

Proceedings for the removal from office of county officers are controlled by the provisions of W. Va. Code § 6-6-7.[2] The circuit court may remove county officers from office "on any of the grounds, or for any of the causes, for which a state

[2] W. Va. Code § 6-6-7 provides in pertinent part:

Any person holding any county, magisterial district, independent school district, or municipal office, including the office of a member of a board of education, the term or tenure of which office is fixed by law, whether elected or appointed thereto, except a judge of a court of record, may be removed by the circuit court of the county wherein such officer or person resides, or the judge of such court in vacation, on any of the grounds, or for any of the causes, for which a state officer may be removed under section five of this article [§ 6-6-5] or for any of the causes or on any of the grounds provided by any other statute. The charges may be preferred, in the case of any county officer, by the county court, or other tribunal in lieu thereof, any other officer of the county, or any five or more voters thereof; in the case of any magisterial district officer or independent school district officer, by the county court, sheriff, or prosecuting attorney of the county in which such district is located, any other officer of such distict, or five or more voters thereof; and, in the case of any municipal officer, by the prosecuting attorney of the county where such municipality is located, any other officer of the municipality, or five or more voters thereof; or, in the case of any of the aforementioned officers or persons, where the removal is sought of an officer or person entrusted by law with the collection, custody and expenditure of public moneys, because of any misapplication, misappropriation, or embezzlement of such moneys, the charges may be preferred by the chief inspector and supervisor of public offices of the State.

The charges shall be reduced to writing and entered of record by the court, or the judge thereof in vacation, and a summons shall thereupon be issued by the clerk of such court containing a copy of the charges and requiring the officer or person named therein to appear before the court or judge, at the courthouse of the county where such officer resides, and answer the charges on a day to be named therein, which summons shall be served, and at least five days before the return day thereof. The court, or the judge thereof in vacation, shall, without a jury, hear the charges and all evidence offered in support thereof, or in opposition thereto, and upon satisfactory proof of the charges shall remove any such officer or person from office, and place the records, papers, and property of his office in possession of some other officer or person for safekeeping, or in the possession of the person appointed as hereinafter provided, to fill the office temporarily.

officer may be removed under section five of this article [§ 6-6-5] or for any of the causes or on any of the grounds provided by any other statute." W. Va. Code § 6-6-7. Section five of Article 6 provides that a state officer may be removed from office "for official misconduct, malfeasance in office, incompetence, neglect of duty, or gross immorality." W. Va. Code § 6-6-5. Removal of public officers from office is a drastic remedy, however, and statutory provisions prescribing the grounds for removal are strictly construed. *In the Matter of Boso*, 160 W. Va. 38, 231 S.E.2d 715 (1977). " 'To warrant removal of an official pursuant to Code, 1931, § 6-6-7, clear and convincing evidence must be adduced to meet the statutory requirement of satisfactory proof.' Point 9, Syllabus, *Evans v. Hutchinson*, 158 W. Va. 359, 214 S.E.2d 453 (1975)." *Id.* The removal order now before the Court recognizes these principles of law and recites that the findings of fact "are based upon clear and convincing proof in the opinion of [the circuit court]." We must examine the lower court's findings of fact with these principles in mind and consider them in light of the evidence on the record.

The circuit court first found the appellant guilty of "willful neglect of duty" because he left a meeting of the Board of Equalization and Review on February 28, 1980, at approximately 4:00 p.m. and did not return until approximately 10:20 p.m. The purpose of that meeting was to hear protests of voters to an order of the Board entered on February 19, 1980, reassessing all Class III surface lands in McDowell County at $300.00 per acre. The circuit court found that the appellant refused "qualified citizens of the county an opportunity to be heard and present evidence". The appellant does not deny that he absented himself from the meeting for some six hours on that date, but contends that the evidence did not support the lower court's finding that he was guilty of willful neglect of duty.

The record shows that the appellant was a teacher and the dean of students at Northfork High School, and had been the coach of the Northfork High School varsity basketball team for some fourteen years. Prior to his election to the McDowell County Commission in November

1978, the appellant had sought and received a letter opinion from the office of the Attorney General of West Virginia advising in effect that a school teacher might be elected to and hold the office of county commissioner without technical conflict in the duties and responsibilities. Conflicts with his coaching duties did develop however, the Attorney General's opinion notwithstanding; and these conflicts are part of the problem with which we are dealing here. On the evening of February 28, the Northfork High School basketball team had scheduled an important pre-tournament game which could not well be rescheduled late in the season. The appellant testified that although the decision was difficult for him, in view of the time and effort he had already devoted to the Board's work that day, he decided to absent himself from the Board meeting at approximately 4:00 p.m. to coach his high school basketball team. Evidence continued to be presented to the Board during the appellant's absence and was reduced to a transcript which was ultimately accepted by the county commission and the circuit court. The appellant returned to the meeting at approximately 10:20 p.m. and continued to hear taxpayer protests on property evaluations until the meeting ended at 11:58 p.m.

The Board was required to adjourn before midnight on February 28 in order to comply with a statutory mandate that the work of the Board of Equalization and Review be completed within 28 days. W. Va. Code § 11-3-24. It appears from the record that all protests were received and considered by the Board and the testimony discloses that even if the appellant and another commissioner, who was absent the greater part of the day, had been present continuously, the Board could not have heard all those who wished to be heard on February 28.

The appellant here had dual public responsibilities. As an elected county commissioner, he had a duty to hear and consider protests of the citizens of the county respecting the reassessment order of the Board of Equalization and Review. He was well aware of the importance of tax revenues to the McDowell County public schools. As a coach in the public school system he had an obligation to his

students and their parents to provide direction and supervision at a basketball game. The appellant was faced with a difficult decision because of this conflict and under the circumstances would have been subject to criticism no matter which course he followed.

We are of the opinion that the appellant's duty to prosecute his responsibilities as an elected officer of McDowell County was paramount to his other obligations. The duty of a public officer to fulfill the obligations of his office should take precedence over all other matters. We do not think, however, that the evidence presented on this issue of an absence from a meeting during his work day consisting of more than nine hours at the business of government is sufficient to sustain removal from office for willful neglect of duty. The appellant returned to the meeting after the basketball game and continued to hear protests until the last possible minute.There is no evidence to support a finding that his absence denied those protesting an opportunity to be heard. While the appellant may have made an error in judgment in placing his duty as a coach above his duty as a public officer, we do not under the facts of this case find this error so egregious as to warrant his removal.

We find this to be especially true when we review the approach taken by the county commission as a whole, of which the appellant was only one member, with respect to its duty under the law to review and equalize tax assessments. Interwoven throughout much of the testimony concerning the appellant's absence from the February 28 meeting of the Board of Equalization and Review is evidence that the Board's action on February 19, 1980, reassessing all Class III surface lands in McDowell County at $300.00 per acre, precipitated most of the February 28 taxpayer protests. In separate litigation, apart from the present public officer removal proceedings, the Circuit Court of McDowell County, with a special judge sitting, invalidated the reassessment by order entered on June 6, 1980. The invalidation order was entered as an exhibit and was made a part of the record in the public officer removal proceedings conducted in the circuit court

on June 23-27, 1980 and was known to the trial judge and litigants during the trial of the removal proceedings. The materiality of Commissioner Boyd's absence for a period of some six hours from the Board's meeting on February 28 and the inability of taxpayers to be heard by the Board on their property valuation protests on that date are evidentiary factors to be considered in the light of the reassessment order entered on June 6 in separate proceedings in the Circuit Court of McDowell County.

Accomplishment of the mission of assessing county property for taxes is a task requiring foresight, cooperation and detailed labor. The primary responsibility for the execution of this duty is vested by statute in the county assessors and the county commissions.[3] The county

---

[3] W. Va. Code § 11-3-1, as amended in 1977, sets forth the responsibilities for county assessor:

All property shall be assessed annually as of the first day of July at its true and actual value; that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property, the value of which is sought to be ascertained, is usually, sold, and not the price which might be realized if such property were sold at a forced sale, except that the true and actual value of all property owned, used and occupied by the owner thereof exclusively for residential purposes shall be arrived at by giving primary, but not exclusive, consideration to the fair and reasonable amount of income which the same might be expected to earn, under normal conditions in the locality wherein situated, if rented: Provided, that the true and actual value of all farms used, occupied and cultivated by their owners or bona fide tenants shall be arrived at according to the fair and reasonable value of the property for the purpose for which it is actually used regardless of what the value of the property would be if used for some other purpose; and that the true and actual value shall be arrived at by giving consideration to the fair and reasonable income which the same might be expected to earn under normal conditions in the locality wherin situated, if rented: Provided, however, that nothing herein shall alter the method of assessment of lands or minerals owned by domestic or foreign corporations. The taxes upon all property shall be paid by those who are the owners thereof on that day, whether it be assessed to them or others. If at any time after the beginning of the assessment year, it be ascertained by the tax commissioner that the assessor, or any of his deputies, is not complying with this provision or that he has failed, neglected or refused, or is failing, neglecting or refusing after five days' notice to list and assess all property therein at its true and actual

commission is required to meet each year "not later than the first day of February" to review and equalize assessments and must complete its work within twenty-eight days, but "shall not adjourn sine die before the

value, the tax commissioner may order and direct a reassessment of any or all of the property in any county, district or municipality, where any assessor, or deputy, fails, neglects or refuses to assess the property in the manner herein provided. And, for the purpose of making such assessment and correction of values, the tax commissioner may appoint one or more special assessors, as necessity may require, to make such assessment in any such county, and any such special assessor or assessors, as the case may be, shall have all the power and authority now vested by law in assessors, and the work of such special assessor or assessors shall be accepted and treated for all purposes by the county boards of review and equalization and the levying bodies, subject to any revisions of value on appeal, as the true and lawful assessment of that year as to all property valued by him or them. The tax commissioner shall, with the approval of the board of public works, fix the compensation of all such special assessors as may be designated by him, which, together with their actual expenses, shall be paid out of the county fund by the county commission of the county in which any such asessment is ordered, upon the receipt of a certificate of the tax commissioner filed with the clerk of the county commission showing the amounts due and to whom payable, after such expenses have been audited by the county commission.

Any assessor who knowingly fails, neglects or refuses to assess all the property of his county, as herein provided, shall be guilty of malfeasance in office, and, upon conviction thereof, shall be fined not less than one hundred not more than five hundred dollars, or imprisoned in the county jail not less than three nor more than six months, or both, in the discretion of the court, and upon conviction, shall be removed from office.

The responsibility of the county commission with respect to tax assessments is detailed in W. Va. Code § 11-3-24, as amended in 1979.

The county commission shall annually, not later than the first day of February, meet for the purpose of reviewing and equalizing the assessment made by the assessor. It shall not adjourn for longer than three days at a time until this work is completed, and shall not remain in session for a longer period than twenty-eight days and shall not adjourn sine die before the fifteenth day of February. At the first meeting, the assessor shall submit the property books for the current year, which shall be complete in every particular, except that the levies shall not be extended. The assessor and his assistants shall attend and render every assistance possible in connection with the value of property assessed by them. The commission shall proceed to examine and review the property books, and shall add on the books the names of persons, the value of personal property and the description

fifteenth day of February." *Code* § 11-3-24. The county assessor is required to submit the property books for the current year to the county commission at its first meeting and to assist the commission in performing its review. W. Va. Code § 11-3-24.

---

and value of real estate liable to assessment which was omitted by the assessor. They shall correct all errors in the names of persons, in the description and valuation of property, and they shall cause to be done whatever else may be necessary to make the valuation comply with the provisions of this chapter. But in no case shall any question of classification or taxability be considered or reviewed. If the commission determines that any property or interest is assessed at more or less than its true and actual value, it shall fix it at the true and actual value. But no assessment shall be increased without giving the property owner at least five days' notice, in writing, and signed by the president of the commission, of the intention to make the increase. Service upon the property owner shall be sufficient, or upon his agent or attorney in person, or if sent by registered mail to such property owner, his agent or attorney, at the last known place of abode. If he be not found and have no known place of abode, then notice shall be given by publication thereof as a Class I legal advertisement in complaince with the provisions of article three [§ 59-3-1 et seq.], chapter fifty-nine of this Code, and the publication shall be at least five days prior to the increase. When it is desired to increase the entire valuation in any one district by a general increase, notice shall be given by publication thereof as a Class II-0 legal advertisement in compliance with the provisions of article three [§ 59-3-1 et seq.], chapter fifty-nine of this Code, and the publication area for such publication shall be the county. The date of the last publication shall be at least five days prior to the increase in valuation. When an increase is made, the same valuation shall not again be changed unless notice is again given as heretofore provided.

The clerk of the county commission shall publish notice of the time, place and general purpose of the meeting as a Class II legal advertisement in compliance with the provisions of article three [§ 59-3-1 et seq.], chapter fifty-nine of this Code, and the publication area for such publication shall be the county involved. The expense of publication shall be paid out of the county treasury.

If any person fails to apply for relief at this meeting, he shall have waived his right to ask for correction in his assessment list for the current year, and shall not thereafter be permitted to question the correctness of his list as finally fixed by the county commission, except on appeal to the circuit court. After the county commission completes the review and equalization of the property books, a majority of the commission shall sign a statement that it is the completed assessment of the county for the year; then the property books shall be delivered to the assessor and the levies extended as provided by law.

Clearly the McDowell County Commission sitting as a Board of Equalization and Review attempted to comply with the statutory reassessment provisions. It endeavored to hear all protests to the reassessment order entered February 19 before it was required to adjourn on February 28. Although the Board was empowered to adjourn after February 15, before the reassessment presentation in this case, it continued its meeting in order to make a fair review of the current assessments. It is unfortunate that the reassessment presentation and the Board's subsequent action in reassessing Class III surface lands did not occur until February 19, just nine days before the Board was required by law to adjourn sine die. The limited amount of time within which protests to the Board's action could be made and heard no doubt contributed to the inability of the Board to hear all of the protestants at the February 28 meeting.

While the law places the primary responsibility for reassessment on the county assessor and county commissions, the total responsibility is more extensive. Citizens, property owners and taxpayers have an obligation to see that their demands and concerns are presented to the Board of Equalization and Review in a timely manner so that the Board will have the opportunity to review adequately reassessment requests and protests. The law does not inhibit advance consideration of the property assessments by the assessor, the county commission, the prosecuting attorney, the board of education, concerned community groups, the state tax commissioner and state organizations of county officials. The assessor's property books should be available for early examination and consideration prior to the county commission's review and equalization meeting which shall commence "not later than the first day of February". Orderly, timely, cooperative efforts on the part of the many persons concerned about and responsible for property assessments and county revenues appear to be an available solution for problems comparable to the situation developed during the meeting of the County Commission of McDowell County on February 28, 1980. We do not think, however, that the ends

of justice can be served or the inability of the McDowell County Commission to hear all protests to its reassessment order can be remedied by the removal from office of one of the county commissioners who was only partly responsible for the delays resulting in the rather harried final Board meeting on that day.

The circuit court's second finding of fact was that the appellant was guilty of malfeasance in office in that he submitted to the county commission vouchers for mileage reimbursement, voted to approve the vouchers and received reimbursement from the county treasury without statutory authority permitting such payments. The record reveals that the appellant did, indeed, submit mileage vouchers and receive reimbursement for trips made by him in his own personal vehicle between his residence in Northfork and the courthouse in Welch for the purposes of performing additional duties required of him as president of the commission, such as signing orders, letters, budgetary items and conducting other county business. The only relevant questions for our consideration are whether mileage reimbursement payments for such trips are authorized by statute and if not, whether the action of the appellant in pressing such claims constitutes malfeasance in office justifying his removal from office.

A similar question of statutory authority to reimburse public officials for travel expenses was before the court in *State ex rel. Carman v. Sims*, 145 W. Va. 289, 115 S.E.2d 140 (1960), where the state auditor was ordered to honor the claims of two employees of the State Tax Department. Although the facts of that case differ materially from the facts before us, the court enunciated several principles regarding the entitlement of state officials to reimbursement for travel expenses which are equally applicable to all public officers. In Syllabus Point 1, the court held that "[i]n the absence of constitutional or statutory provisions directly or by necessary implication conferring such right, a State official or employee has no right to receive reimbursement for expenses incurred in the course of his

official duties." 115 S.E.2d at 141. "In the absence of specific legislation, a state official is not entitled to reimbursement for expenses incurred in traveling from his home to his place of employment (citations omitted)". *Id.* at 143. While *Carman* speaks only to the right of state officials to reimbursement for travel expenses, we think the principal is applicable to all public officers and that no public officer, agent or employee is entitled to publicly provided carriage or to reimbursement for expenses incurred in traveling from his residence to his workplace and returning unless such a subsidy has been specifically authorized by the legislature. "[I]n the absence of an applicable statute or a valid regulation adopted pursuant thereto, . . . an official or employee of a state, or other unit of government, is presumed to have his headquarters at the state capitol, county courthouse, or city hall, and ... he may be reimbursed only for expenses incurred by necessary traveling which begins and ends at those places." The principle is equally applicable to public officials and employees whose actual place of employment is at some other building or office provided by the public.

The appellant submitted vouchers for mileage reimbursement pursuant to W. Va. Code § 7-7-16 which authorizes the county commissions to reimburse county officials and employees at a rate of seventeen cents per mile "when they are required to drive their personally owned vehicles in the actual performance and discharge of their official duties ...". The statute does not specifically authorize county officers to be reimbursed for trips made between their homes and the courthouse and therefore does not permit the payment of such mileage reimbursement under the *Carman* rule requiring specific statutory authorization. *See, e.g.*, W. Va. Code §§ 4-2A-6, 4-2A-10 and 6-7-5. The appellant contends, however, that the trips he made were "special trips" which were made "in the actual performance and discharge of his official duties" and are therefore included within the statute.

It is clear that the tasks which required the appellant to drive from his residence to the courthouse were manage-

rial duties which were to be performed in his office at the courthouse. He was not required to travel anywhere other than to his place of employment to actually perform those duties. This is in sharp contrast to certain duties of county commissioners, for example, such as visiting and inspecting county institutions and bridges and attending regional or district meetings, which by their nature can often be performed only at a location some distance from the commissioners' ordinary place of business, the county courthouse. *See* W. Va. Code § 7-1-5. In such circumstances, the travel required to place the commissioner at the location where the duty is to be performed can legitimately be said to be "in the actual performance or discharge" of the officer's official duties. The same cannot be said for the trips for which the appellant submitted mileage reimbursement vouchers. We conclude, therefore, that in limiting the mileage allowance provisions of W. Va. Code § 7-7-16 to occasions where county officials and employees are "required to drive their personally owned vehicles in the actual performance and discharge of their official duties", the legislature intended to authorize mileage reimbursement only where the nature of the duty to be performed requires the county official or employee to drive his or her own vehicle to some location other than his or her ordinary place of official employment in order to discharge that duty. This interpretation of the statute is analogous to the rule in workmen's compensation cases disallowing compensation for injuries received going to or coming from work, except in certain recognized circumstances. *See* W. Va. Code § 24-3-1 *Harris v. SWCC*, 158 W. Va. 66, 208 S.E.2d 291 (1974); *Buckland v. State Compensation Comm'r.*, 115 W. Va. 323, 175 S.E. 785 (1934). *See also* I.R.C. § 162; Treas. Reg. § 1.162-2 (1980) (Internal Revenue Code does not permit travel expenses incurred in commuting to and from work to be deducted as "business expense"). The principle also controls the use of publicly owned vehicles by employees and officers of the state, county or other unit of government. The circuit court correctly found that payment of mileage reimbursement by the county commission in this case was not authorized by statute and that the

appellant was therefore not entitled to submit vouchers for such reimbursement.

The question now remains whether the appellant's actions in submitting such vouchers and in voting to approve the reimbursement payments constituted malfeasance in office so as to warrant his removal from office. Malfeasance in office has been defined as "the doing of some act which is positively unlawful or wrongful or an act which the actor has no legal right to do, or as any wrongful conduct which affects, interrupts or interferes with the performance of official duty". *Daugherty v. Ellis*, 142 W. Va. 340, 97 S.E.2d 33 (1956). In view of our interpretation of the mileage allowance statute above, it is clear that the appellant had no legal right to submit vouchers or to receive reimbursement for the expenses he incurred here. It appears from the record, however, that his actions were the result of an erroneous interpretation of the statute in question.

The mileage allowance statute was first enacted in 1971, more than ten years after the holding in *State ex rel. Carman v. Sims, supra.* 1971 Acts, ch. 23. This is the first opportunity we have had to interpret the statute with respect to the issue presented here. Unlike the specific provisions which set forth the compensation to be paid to county commissioners, W. Va. Code §§ 7-1-4, 7-1-5a, the mileage allowance statute is ambiguous in that it is susceptible to more than one construction by reasonable, literate persons. While the construction placed on the statute by the appellant was erroneous, we cannot say that it was unreasonable in view of the ambiguity on the face of the provision and the absence of prior guidance in the proper interpretation of the statute. We do not think that the strict application of the rule of *Daugherty v. Ellis, supra*, should obtain in this case. Rather, we think that where removal proceedings against a layman public officer on charges of malfeasance in office arise from his erroneous interpretation of a statute which has never before been interpreted and ambiguity exists in the statute such that it is capable of being understood by reasonably well-informed persons in more than one sense, removal from office can be a more drastic remedy than the offense calls

for. While the law is clear that it is unnecessary to show a specific intent to defraud or that the wrongful act is criminal or corrupt in character in order to establish malfeasance in office, *Daugherty v. Ellis, supra,* the majority of the Court believes that here the ends of justice are sufficiently served if the officer is required to repay the sums which he obtained without legal authority.

In the third of the trial court's findings of fact, appellant Boyd, as an official of the McDowell County Commission, is found to have voted for, authorized directed Frank Serge, Jr., to order the hauling of gravel for county road repair work in the areas of Gilliam, Upland and Maybeury, on February 13, 1979, when Serge was an employee of the commission and had no authority to so order the gravel hauling. In the language of the trial court's order the "defendant had a clear duty prior to any act by said Commission to determine the cost and price of said hauling and laying of gravel and his failure and action in voting for the above-referred to authorizations, is a neglect of his duty as a public official and is misfeasance in office".

The February 5, 1979 minutes of the County Commission of McDowell County record that on motion, unanimously adopted, "the position of Assistant Landfill director and Assistant purchasing agent" was eliminated effective February 15, 1979. At the same commission session, the minutes record a motion, unanimously adopted, providing for the employment of Frank Serge, Jr., as County Coordinator and County Administrator effective February 15, 1979. The February 13, 1979 minutes of the commission record that on motion made by President Boyd and seconded by Commissioner Lawson, orphan road work was approved for the areas of Maybeury, Upland, Gilliam, Northfork, Crumpler, Eckman, Algoma, Switchback and Rolfe, with directions to "the county administrator to oversee these projects none of which will exceed the $2,000.00 limit." February 13, 1979, was on Tuesday and February 15 was on Thursday, the effective date of the new county administrator's employment. The commission's minutes for Tuesday, February 20, 1979, record 15 separate

appropriations of specific tons of gravel for various communities in the county.

The record includes three McDowell County Commission applications for road work or repair, dated February 14, 1979, showing approximately 150 tons of gravel needed for the Gilliam area, 150 tons needed for the Maybeury area, and 150 tons needed for the Upland area. The three applications are initialed FSJ, but otherwise do not disclose when they were initialed. The indicated tons of gravel were appropriated for the Gilliam, Maybeury and Upland communities in the February 20, 1979, minutes of the Commission.

The confused record reveals considerable testimony and several exhibits relating to the gravel hauling and orphan road work, but does not conclusively sustain the charges in paragraph 10 of the petitioners' petition for removal of public officer nor does the evidence sustain the trial court's findings and conclusion on this issue. The absence of clear and convincing evidence in the record to support the charges presented in the petition and to sustain the trial court's findings of fact eliminates this issue as a basis for appellant's removal from office. Neglect of duty as a public official and misfeasance in office have not been established "upon satisfactory proof of the charges". W. Va. Code § 6-6-7. 63 Am. Jur. 2d Public Officers and Employees, §§ 190-191 (1972).

As a final matter, we would like to commend the circuit court on its swift and incisive handling of the case. Too often in removal proceedings political considerations interfere with the efficient administration of justice. While we reverse the circuit court's removal order, we note that this case presented novel issues for our consideration which, but for the peculiar facts and circumstances of this case, would have been resolved differently. Our decision should not reflect adversely on the courage, vigilance, quality, dignity or integrity of the circuit court in insuring that our public officials neither exceed the powers of their offices nor neglect the duties imposed upon them by law.

Upon careful review and consideration of the record, together with the briefs and arguments of counsel, we cannot say that clear and convincing evidence which supports and warrants removal from office here. We conclude that the circuit court's judgment order of August 28, 1980, removing appellant from office will not be sustained. Accordingly, the judgment of removal is reversed and remanded to the Circuit Court of McDowell County for disposition in accordance with this opinion.

*Reversed and remanded.*